# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2023 Fall Term

_____

No. 22-ICA-81

_____

**FILED**

**November 8, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

AMANDA TAYLOR
Claimant below, Petitioner,

v.

WORKFORCE WEST VIRGINIA and DISMAS CHARITIES, INC.,
Respondents below, Respondents.

_____

Appeal from the Board of Review of Workforce West Virginia
(Case No. R-2021-4361)

REVERSED AND REMANDED

_____

Submitted: September 6, 2023
Filed: November 8, 2023

James D. Kauffelt, Esq.
Kauffelt & Kauffelt
Charleston, West Virginia
Counsel for Petitioner

Kimberly A. Levy, Esq.
Workforce West Virginia
Charleston, West Virginia
Counsel for Respondent Workforce West
Virginia

CHIEF JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Chief Judge:

Petitioner, Amanda Taylor appeals the Workforce West Virginia Board of Review's ("Board") August 4, 2022, order affirming an administrative law judge's ("ALJ") decision denying Ms. Taylor's claim for unemployment compensation benefits. Upon review, we conclude that the Board's August 4, 2022, order is clearly wrong. The record does not establish that Ms. Taylor received a qualifying prior written warning of possible termination of her employment for non-compliance with her employer's new COVID-19 vaccine mandate, as required by West Virginia Code § 21A-6-3(2)(2020). Additionally, because Ms. Taylor's employer did not rebut her showing of reasonable fear of harm in receiving the COVID-19 vaccine, the Board was clearly wrong in finding any misconduct on Ms. Taylor's behalf leading to the termination of her employment. Accordingly, we reverse the Board's August 4, 2022, order and remand this case to the Board for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

From February 20, 2019, through October 15, 2021, Ms. Taylor was employed, on a part time basis, by Respondent Dismas Charities, Inc. ("Dismas") as a relief cook/relief resident monitor at a halfway house.[1] On January 11, 2021, Dismas' corporate office issued a notice to all Dismas' employees establishing a new mandatory COVID-19

---

[1] Dismas is not participating in this appeal.

vaccination requirement.[2] The notice provided that if there was a documented medical reason why an employee could not take the COVID-19 vaccine that the employee must provide documentation of the same to his/her director or supervisor. The notice was initially sent as an email from Dismas' CEO, Ray Weis, to all Dismas employees (at their company assigned email address) and then posted on two staff bulletin boards at the Dismas facility where Ms. Taylor worked.

On August 20, 2021, a second email was sent by Mr. Weis to all Dismas' employees regarding the new mandatory COVID-19 vaccine requirement, which stated that employees who did not receive the COVID-19 vaccine would not be allowed to access a Dismas facility, or to participate in in-person meetings after October 15, 2021. Further, the August 20, 2021, email provided that anyone who was disabled, had a qualified medical condition, or who objected to the COVID-19 vaccine on religious grounds, could request an accommodation in lieu of receiving the vaccine. A copy of the August 20, 2021, email was allegedly printed and placed in Ms. Taylor's work mailbox, as well as posted on the staff bulletin boards at the Dismas facility where Ms. Taylor worked.

On October 15, 2021, Ms. Taylor was discharged from her employment with Dismas for noncompliance with the company's new mandatory COVID-19 vaccine policy. Ms. Taylor subsequently filed a claim for unemployment compensation benefits. In a

---

[2] There is no dispute that at the time Ms. Taylor was hired at Dismas there was no vaccination requirement for COVID-19.

Workforce West Virginia Deputy's Decision, dated November 9, 2021, Ms. Taylor's claim for unemployment benefits was denied because she was found to have been given a prior written warning of possible termination for noncompliance, and was therefore found to have committed gross misconduct, under West Virginia Code § 21A-6-3(2), when she refused the COVID-19 vaccine. Ms. Taylor was deemed disqualified from receipt of unemployment benefits beginning October 10, 2021. She appealed the Deputy's decision to the Board.

On December 7, 2021, a hearing was held before the Workforce West Virginia ALJ. At the hearing, Ms. Taylor testified that she refused the COVID-19 vaccine on medical and religious grounds.[3] She stated that she had a prior allergic reaction to the flu shot but advised that her corresponding medical records could not be located after the death of her former physician. Dismas' representative James Sands (director of the Dismas center at which Ms. Taylor was employed) also testified before the ALJ and acknowledged having been advised by Ms. Taylor that she had a medical objection to taking the COVID-19 vaccination. Specifically, Mr. Sands testified as follows:

> Q    [Ms. Taylor's counsel]: Okay. Now. Did she come to you and – and tell you that she had a medical reason for not having -- taking the vaccination but couldn't document it?
>
> A    [Mr. Sands]: She did.
>
> .    .    .

---

[3] Specifically, Ms. Taylor testified that she had a previous allergic reaction to a flu shot. Further, Ms. Taylor testified that she objected to the vaccine for religious reasons because she opposes abortion, and the vaccine allegedly contains "aborted fetal tissue." *See* Designated Record at page D.R. 0031.

3

Q      [Ms. Taylor's counsel]: Okay. All right . . . would – you agree with me that Ms. Taylor did explain to you why she could not – that she had a medical reason and explained to you why she couldn't come up with documentation of it and that was insufficient.

A      [Mr. Sands]: She advised me that she did have a medical reason and she couldn't get documentation. . .

*See* Designated Record at pages D.R. 0027 and 0028.

Ms. Taylor further testified that she did not receive either the January 11, 2021, or August 20, 2021, emails regarding the new vaccination policy. She stated that she was not even aware that she had a Dismas email account and, accordingly, had not received any of the emails sent to that account. Ms. Taylor acknowledged that she had a physical work mailbox at the Dismas facility that she checked regularly but testified that she never received any of the documents at issue in that mailbox.

During his testimony before the ALJ, Mr. Sands acknowledged that Ms. Taylor did not receive the emails from Dismas regarding the COVID-19 vaccination requirement.[4]   Further, Mr. Sands admitted that neither of the emails specifically advised

---

[4] Before the ALJ, Mr. Sands, testified as follows:

Q      [Ms. Taylor's counsel]: Did Amanda Taylor get this email? Yes or no?

A      [Mr. Sands]: No.

.      .      .

Q      [Ms. Taylor's counsel]: . . . Did she get the email?

4

Dismas employees, such as Ms. Taylor, that they would be "fired" if they did not get the COVID-19 vaccine. *See* Designated Record at page D.R. 0027. However, Mr. Sands stated that he liked to text his employees, including Ms. Taylor, and advised that even if she hadn't received the emails or seen the bulletin board posts that Ms. Taylor had received his text providing similar information. Yet, Mr. Sands subsequently acknowledged that neither his texts nor the emails advised Ms. Taylor that if she did not get the COVID-19 vaccine by October 15, 2021, that she would be fired. *See* Designated Record at page D.R. 0028.

Ultimately, the ALJ determined that Ms. Taylor had continually refused to be vaccinated, which was considered gross misconduct. The ALJ determined that Ms. Taylor was aware that she could not continue to work for Dismas if she did not receive the COVID-19 vaccine, and that she had received multiple written warnings from her employer regarding the same, "through email as well as posting the same notice on the employee [sic] bulletin board . . . ." *See* Designated Record at page D.R. 0014. The ALJ concluded that Ms. Taylor:

> was warned multiple times in writing, despite the agreement that she did not know about the universal [vaccination] policy or the exemptions. Therefore, because multiple warnings were promulgated in writing and the employer even allowed extensions of the deadlines [Ms. Taylor] was discharged for acts of gross misconduct per the prior written warning that termination of employment may result from such act or acts.

A    [Mr. Sands]: She didn't get the email.

*See* Designated Record at pages D.R. 0026 and D.R. 0027.

5

*See* Designated Record at pages D.R. 0015.

The ALJ issued his decision on May 16, 2022, affirming the deputy's decision that Ms. Taylor had been discharged for gross misconduct and, accordingly, that she was disqualified from the receipt of unemployment benefits. Ms. Taylor subsequently appealed the ALJ's decision to the Board on May 23, 2022. By order entered on August 4, 2022, the Board affirmed the decision of the ALJ. Specifically, the Board found that the ALJ "has made a proper ruling" and it adopted the ALJ's findings "by reference in its entirety." It is from the Board's August 4, 2022, order that Ms. Taylor now appeals.

## II. STANDARD OF REVIEW

"The findings of fact of the Board of Review of [Workforce West Virginia] are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*." Syl. Pt. 3, *Adkins v. Gatson*, 192 W. Va. 561, 453 S.E.2d 395 (1994).

## III. DISCUSSION

On appeal, Ms. Taylor advances three assignments of error. First, she argues that she did not receive a qualifying written warning from Dismas prior to the termination of her employment. Second, she contends that in the absence of a qualifying prior written warning, her behavior did not rise to the level of gross misconduct warranting the

6

termination of her employment. In her final assignment of error, Ms. Taylor alleges that the Board erred in finding any misconduct on her part and, accordingly, was clearly wrong in denying her claim for unemployment benefits. Because Ms. Taylor's assignments of error overlap, we will consider them together.

The Supreme Court of Appeals of West Virginia ("SCAWV") has examined eligibility and disqualification provisions related to the receipt of unemployment compensation benefits and has held that in the application of such provisions, "[t]he first step involves determining whether an individual is eligible to receive such benefits, and the second step is to consider whether the individual is disqualified." *Lough v. Cole*, 172 W. Va. 730, 310 S.E.2d 491 (W. Va. 1983). Further, in resolving issues of unemployment compensation, the SCAWV has consistently recognized "that unemployment compensation statutes are to be construed liberally in favor of the claimant." *Dailey v. Board of Review, West Virginia Bureau of Employment Programs*, 214 W.Va. 419, 428, 589 S.E.2d 797, 806 (2003). "Any doubt is to be resolved in favor of a construction which does not work a disqualification." *Id.* At 428.

In this appeal, Ms. Taylor was deemed eligible for unemployment compensation benefits, but was disqualified for receiving said benefits on the grounds of gross misconduct based on her failure to get the COVID-19 vaccine by an appointed date, despite prior written warnings. In addressing Ms. Taylor's arguments on appeal, we must first determine if she received a qualifying prior written warning. West Virginia Code §

7

21A-6-3(2) provides, in pertinent part, the following as to gross misconduct: "[t]hat for the purpose of this subdivision, the words 'any other gross misconduct' includes, but is not limited to, any act or acts of misconduct where the individual has received prior written warning that termination of employment may result from the act or acts." Hence, we must determine if Ms. Taylor received notice of the possible termination of her employment for failure to comply with the vaccine mandate.

At the heart of any notice requirement is the necessity to establish an individual's receipt of said notice. Here we find that Ms. Taylor received insufficient notice of the possible termination of her employment for failure to receive the COVID-19 vaccination. The record herein includes three possible notices of termination, which included two emails and one text message.[5] Dismas' new mandatory COVID-19 vaccine requirements were allegedly sent twice to Ms. Taylor via email and posted on bulletin boards at the Dismas facility. However, Ms. Taylor testified that she was not even aware that she had a Dismas company email and accordingly had never checked said email. Ms. Taylor's position with Dismas, as a relief cook and resident monitor, did not require her use of a company email address. In fact, her supervisor Mr. Sands acknowledged that while every Dismas' employee has a company email account, that most employees "don't bother to activate it." *See* Designated Record at page D.R. 0026. Such testimony highlights

---

[5] Consistent with the SCAWV's decision in *Federoff v. Rutledge*, 175 W. Va. 389, 394, 395 (1985), oral warnings will not be considered as the unambiguous language of the statute requires a written warning.

8

that Dismas was aware that communicating with employees via company email was not an effective means of communication and, accordingly, did not serve as a proper avenue to provide notice to employees. Most importantly to this issue is the fact that during testimony before the ALJ, Mr. Sands expressly testified that Ms. Taylor did not receive the emails at issue. Further, Mr. Sands acknowledged that the emails did not advise Ms. Taylor that if she did not receive the COVID-19 vaccination that her employment would be terminated.

With respect to the alleged bulletin board posts, Ms. Taylor testified that she did not see any posting on the company bulletin board regarding the new mandatory COVID-19 vaccine requirements and/or any warnings for noncompliance with such requirements. As the SCAWV noted in *Federoff*, posting on a bulletin board is neither contemplated nor sufficient notice provided by an employer, as mere posting does not prove individual receipt to an employee, which is required under West Virginia Code § 21A-6-3(2). *See Federoff*, 175 W. Va. 389, 394 n.4 (1985). We concur with the SCAWV's reasoning in *Federoff* and we are not persuaded by Dismas' suggestion below that such posting on a company bulletin board served as adequate notice to Ms. Taylor.

The last exhibit in the record is the text exchange between Ms. Taylor and Mr. Sands. The text chain shows Mr. Sands sending photographs of the two emails discussed above to Ms. Taylor on August 23, 2021, and a subsequent message to her on October 1, 2021, asking if she had decided to resign or get terminated on October 15, 2021.

9

Ms. Taylor responded with "I'm not going to resign," to which the employer says "Ok. That provides clarity." This exchange relies heavily upon the language contained within the two previously discussed emails and an oral discussion, none of which is in compliance with the express requirements of West Virginia Code § 21A-6-3(2). Based on the undisputed written documents contained in the record, none of this documentation expressly advises Ms. Taylor that she will be terminated from employment if she does not receive the COVID-19 vaccine by October 15, 2021. As noted above, Dismas' representative Mr. Sands acknowledged the same before the ALJ.

Additionally, while Mr. Sands testified that he placed a hard copy of the August 20, 2021, email outlining Dismas' new COVID-19 vaccine requirement in Ms. Taylor's work mailbox, Ms. Taylor testified that despite her checking her work mailbox often that she received no such documentation. In rendering his decision, the ALJ below made no findings as to whether Ms. Taylor received notice by means of her work mailbox. Additionally, the ALJ made no findings as to the text message between Mr. Sands and Ms. Taylor. Thus, we find that the alleged placement of a printed copy of one or both of the emails in Ms. Taylor's facility mailbox or the text message between Mr. Sands and Ms. Taylor could not now serve as a basis to conclude that Ms. Taylor ever actually received notice.

According, based on the foregoing, we find that the Board was clearly wrong

in determining that Ms. Taylor received prior written warning that termination of employment may result from her failure to get the COVID-19 vaccine. During oral argument, counsel for Workforce inferred that Ms. Taylor had actual knowledge, and therefore, the notice was sufficient. However, in order to justify a finding of gross misconduct under West Virginia Code § 21A-6-3(2), there must be strict compliance with the formal notice requirements. Here, the Board was clearly wrong in affirming the finding of gross misconduct based upon prior written warning. We find it troubling that the ALJ made a specific finding that Dismas gave notice to Ms. Taylor through email, when Dismas' own representative acknowledged that Ms. Taylor did not receive the subject emails. Further, we are troubled by the ALJ's determination that posting of an email on a bulletin board was sufficient notice, when the SCAWV has reasoned that simple posting of such a notice on a bulletin board is insufficient.

Even if the notice to Ms. Taylor was sufficient, under the limited facts and circumstances of this case, we find that the content of the alleged notices themselves failed to justify a finding of gross misconduct on Ms. Taylor's behalf. The January 11, 2021, email notifying staff of the new vaccine requirement contained no language of any disciplinary action should an employee fail to comply with the new requirement. Similarly, the August 20, 2021, email also failed to notify the recipient of any disciplinary measures which would satisfy the West Virginia Code § 21A-6-3(2) requirement of prior written warning that termination of employment may result from the act of acts. The August 20, 2021, email stated that staff was required to "obtain and maintain up to date [COVID]-19

11

vaccinations to access [Dismas'] physical office locations or to engage in business travel or in-person work meetings." The email goes on to state: "[f]raudulent documentation or an unauthorized attempt to enter a location may result in disciplinary action up to and including termination of employment." It is abundantly clear that the only notice of termination of employment discussed in either of these emails is regarding fraudulent documentation or an unauthorized attempt to enter a location. Nothing in either of the emails suggests that refusal to receive the COVID-19 vaccination would result in termination of employment. This interpretation is ratified by Mr. Sands' testimony before the ALJ in which he agrees that neither email informed Ms. Taylor that failure to receive the vaccination would result in termination of her employment.

In addressing Ms. Taylor's final assignment of error, we must assess if she committed any misconduct. The ALJ's order, which was adopted in its entirety by the Board, fails to conduct the appropriate analysis regarding whether Ms. Taylor committed any misconduct. The Board's order focuses on whether Ms. Taylor correctly complied with the medical or religious exemption procedure. However, correct compliance with such procedures would have an impact on whether she was wrongfully terminated, but not on whether she is disqualified from unemployment benefits. In assessing simple misconduct, we must determine if Ms. Taylor's refusal to obtain the COVID-19 vaccine constituted misconduct.

The SCAWV has long held that the disqualifying provisions of the unemployment compensation law are to be narrowly construed. Syl. Pt. 1, *Peery v. Rutledge*, 177 W. Va. 548, 355 S.E.2d 41 (1987). Is assessing misconduct, the SCAWV has stated:

> [t]he former employer's job assignment directive or work rule must be reasonable under the particular circumstances, and the unemployment compensation claimant's reason for disregarding the job assignment directive or work rule must be examined to determine whether the claimant was justified, or at least exercised good faith, in not complying with the directive or rule.

*Id.* at 551.

In *Peery*, the SCAWV reversed a finding of misconduct when the employee, who was a truck loader and emergency truck driver, refused to drive a route following a full day shift, stating he was too exhausted and not alert enough to drive on a windy mountain road. The concern by the employee in *Peery* was for the safety of himself and others in operating a vehicle while exhausted.

The *Peery* decision specifies the analysis that should have been conducted by the ALJ in the proceedings below:

> If the former employer establishes that the unemployment compensation claimant has violated an ordinarily reasonable job assignment directive or work rule, the burden of going forward with the evidence shifts to the claimant to show that he or she was justified, or at least exercised good faith, in not complying with the directive or rule. *See Amador v. Unemployment Insurance Appeals Board,* 35 Cal. 3d 671, 681 n. 7, 200 Cal.Rptr. 298, 303 n. 7, 677 P.2d 224, 229 n. 7 (1984). If the claimant then introduces evidence of his or her reasonable fear of harm to the claimant's or others' health or safety, the former employer must rebut the reasonableness of the claimant's apprehension. These specific evidentiary rules are derived from the broader rule that the burden of persuasion is upon the former employer to demonstrate by the preponderance of the evidence that the claimant's conduct

13

falls within a disqualifying provision of the unemployment compensation statute. *See Bennett v. Hix,* 139 W.Va. 75, 84-85, 79 S.E.2d 114, 119 (1953); *Industrial Laundry v. Review Board,* 147 Ind.App. 40, 44, 258 N.E.2d 160, 163 (1970); *Gatlin v. Brown,* 154 So.2d 224, 226 (La.Ct.App.1963).

*Id.* at 551.

Applying these principles to the present case, as Ms. Taylor acknowledged her failure to follow a directive of her employer, the burden of moving forward shifted to her to present evidence of her good faith in not complying with the directive of her employer. Once she introduced evidence of her fear of the COVID-19 vaccine based on her own prior experience, the burden fell to the employer to rebut the reasonableness of her apprehension. A review of the record shows that the employer failed to introduce any such evidence. While a lack of medical records may be a sufficient basis to deny a request for a medical exemption, such absence of records by itself does not rebut the reasonableness of Ms. Taylor's fear or apprehension. Accordingly, under the guidance of *Peery*, and given the evidence in the record, we find that Dismas failed to meet its burden to show that the conduct of Ms. Taylor fell within a disqualifying provision of the unemployment compensation statute. Thus, we conclude that the ALJ was clearly wrong in assessing misconduct on the part of Ms. Taylor and the Board was clearly wrong in its affirmation of the ALJ's decision.

## IV. CONCLUSION

Accordingly, we reverse the BOR's finding that Ms. Taylor committed any misconduct and remand this case for further proceedings consistent with this opinion.

Reversed and Remanded.

14